# EXHIBIT B

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        19-CR-69(PKC)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5           -against-                   December 11, 2019
                                        10:00 a.m.
6    JAVIER RODRIGUEZ,

7           Defendant.

8    ------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
                BEFORE THE HONORABLE PAMELA K. CHEN
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
13                              271 Cadman Plaza East
                                Brooklyn, New York 11201
14                              BY:  NADIA MOORE, ESQ.
                                     NADIA SHIHATA, ESQ.
15                              Assistant United States Attorneys

16   For the Defendant:        LAW OFFICE OF NATALI J.H. TODD
                                26 Court Street
17                              Brooklyn, New York 11242
                                BY:  NATALI TODD, ESQ.

18

19   Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                                Phone:  718-613-2268
20                              Email:  RivkaTeich@gmail.com

21   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
22

23

24

25

SENTENCING

1                    (In open court.)

2              THE COURTROOM DEPUTY:  All Rise.  Criminal cause for

3    sentencing, docket 19-CR-69, United States V. Rodriguez.

4              State your appearance.

5              MS. MOORE:  Nadia Moore and Nadia Shihata for the

6    United States.

7              THE COURT:  Good afternoon.

8              MS. TODD:  Natali Todd for Mr. Rodriguez who is

9    seated to my right.

10             THE COURT:  Good afternoon to you Ms.Todd and

11   Mr. Rodriguez.

12             As everyone knows, we're here for sentencing in this

13   matter.  Let me start off by placing a few things on the

14   record.  The defendant pled guilty before me on June 12, 2019.

15   He pled guilty to a single-count Indictment charging him with

16   assault with a dangerous weapon in violation of 18 U.S.C.

17   Section 1959(a)(3) as well as New York Penal Law Section

18   120.05(2) and section 20.00.

19             I have received and reviewed in preparation for

20   sentencing the Probation Department's presentence report dated

21   October 21, 2019, as well as an addendum to that report dated

22   December 11, 2019.  I will also mention that the Probation

23   Department has provided me with a sentencing recommendation

24   dated November 27, 2019 which recommends a sentence of 41

25   months' incarceration to run consecutive to any potential

SENTENCING

1    local sentences that are imposed on the defendant in

2    connection with his pending state prosecutions as well as

3    three years of supervised release.

4              I've received and reviewed the defense sentencing

5    submissions dated November 3, 2019 and December 6, 2019.

6              Lastly I received and reviewed the Government's

7    sentencing submission December 6, 2019.

8              Is there anything else I should have from the

9    Government?

10             MS. MOORE:  I don't believe so, your Honor.

11             THE COURT:  From the defense?

12             MS. TODD:  I don't believe so, your Honor.  It's

13   hard to hear the Court and listen at the same time.

14             THE COURT:  I have two sentencing letters from you,

15   one dated December 3 and 1 dated December 6.  I'll note for

16   the record that I haven't reviewed either parties' objections

17   to the presentence report that were sent to probation because

18   those weren't filed; however, as we'll discuss in a moment,

19   the substance of those objections were summarized by the

20   Probation Department in the addendum in which they address

21   them.  So unless the parties feel differently, I don't feel

22   the need to review the objections themselves.

23             MS. MOORE:  The Government's objections to the

24   guidelines were included in our sentencing letter.  We didn't

25   separately file anything with the Probation Department.

SENTENCING

1          THE COURT:  I didn't look at the dates, I guess that

2     is possible.  I know that your sentencing submission, what I

3     thought, reiterated your objections because it seemed to me --

4     hold on, the addendum is dated -- it's possible --

5     December 11, 2019.  And then your sentencing submission is

6     December 6, 2019.  I gather the Probation Department simply

7     read your sentencing submission -- the Government's -- I was

8     incorrect.  The addendum is dated and filed December 10, 2019

9     from the Probation Department.

10          But at any rate, it is possible that the Probation

11    Department simply read the Government's sentencing submission

12    which contains the objection and responded to those.  I had

13    incorrectly assumed that they had previously received

14    objections from the Government, as sometimes happens.

15          Ms.Todd, did you file more than one submission on

16    December 6?

17          MS. MOORE:  I think she just originally filed it

18    under seal.  When I requested that she send me a copy, she

19    realized it was filed under sealed and may have refiled it.

20          MS. TODD:  What occurred, your Honor, is I attempted

21    to file a supplemental, which was filed publicly.  But the

22    drop down menu said it was sealed.  Eventually I filed it as a

23    letter then made it public, but there is nothing under seal.

24          THE COURT:  So it's correct that all that you've

25    actually filed is an original sentencing submission and then a

SENTENCING

1   reply or supplemental sentencing submission, the dates being

2   December 3 and December 6, correct?

3           MS. TODD:  The Court is correct.  And I did file a

4   objection letter on October 25 just with the Probation

5   Department, and she's included it in her response dated I

6   guess the 11th, last night.

7           THE COURT:  Okay.  I have relied on the addendum in

8   terms of understanding the objection that was made by the

9   defense, but obviously I'll give you a chance to reargue that

10  now.

11          Now, is there anything else I ought to have from the

12  Government?

13          MS. MOORE:  No, your Honor.

14          THE COURT:  And from the defense?

15          MS. TODD:  No, your Honor.

16          THE COURT:  Ms.Todd, have you reviewed with your

17  client the presence report and addendum?

18          MS. TODD:  I have, your Honor.

19          THE COURT:  Is either side seeking an evidentiary

20  hearing on any issue relating to sentencing?

21          THE COURT:  I know you're pausing.  I gather you're

22  prepared to play some of the videos that have previously been

23  provided to me?

24          MS. MOORE:  That's correct.

25          THE COURT:  I don't know if that's argument or

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1   hearing, but I'm prepared to view those again.

2          Anything from the defense?

3          MS. TODD:  No, your Honor.  I'll simply make my

4   usual sentencing arguments.

5          THE COURT:  All right.  To the Government, was the

6   victim of this crime of conviction notified of his right to

7   attend the sentencing?

8          MS. MOORE:  Yes.  Our victim witness coordinator

9   informed his attorney of the date of sentencing today.

10          THE COURT:  Is he still in custody as far as you

11   know?

12          MS. MOORE:  I'm not sure if he's been released or

13   not, I'm not aware.

14          THE COURT:  He was notified of this sentencing?

15          MS. MOORE:  Through his attorney, that's correct.

16          THE COURT:  Did he indicate any desire to either

17   submit a victim statement or to speak at the sentencing?

18          MS. MOORE:  He did not.

19          THE COURT:  All right.  Let's talk now about the

20   guidelines.  In the original presentence report the Probation

21   Department calculated a total offense level of 20, based on

22   the calculation reflected in paragraph 17 through 28 of the

23   presentence report, which I'll refer to as the PSR.  As

24   reflected in the addendum to the PSR, the Government objected

25   to that calculation, arguing that it should have included a

SENTENCING

1  two-level enhancement for more than minimal planning and a

2  two-level enhancement for physical restraint.

3         The Probation Department disagreed with the

4  Government on the more than minimal planning enhancement; but

5  agreed with it on the physical restraint enhancement and added

6  two levels for physical restraint in its revised guidelines

7  calculation as set forth in the addendum.

8         Now as also reflected in the PSR addendum and

9  referenced by Ms.Todd, the defense objected to the original

10 guidelines calculation on the basis that the five-level

11 enhancement for serious bodily injury was too high and that

12 the appropriate enhancement was three levels.  The Probation

13 Department agreed with defense counsel that three levels was

14 appropriate, and lowered the injured enhancement to three

15 levels in its revised guideline calculation.

16        The net effect for purposes of the Probation

17 Department's guidelines calculations is that these two changes

18 cancel each other out.  The total offense level, as indicated

19 in the PSR addendum, remains at 20.  That's the Probation

20 Department's guideline's calculation.

21        In criminal history category one, level 20 results

22 in a guideline range of 33 to 41 months.  However, the

23 Probation Department also noted in the PSR and confirmed in

24 its addendum over the defense's objection, that criminal

25 history category one understates the seriousness of

SENTENCING

1    defendant's criminal history and potential for recidivism

2    given that the defendant committed the instant offense while

3    incarcerated on indicted charges of arson and attempted

4    murder, among others, and is also facing separate indicted

5    charges of robbery and gang assault.

6            In the parties' sentencing submissions, the

7    Government has set forth or reiterated their objections to the

8    Probation Department's guideline calculation.  And the defense

9    in its second submission has responded to the Government's

10   argument or objection, I should say, about the more than

11   minimal planning enhancement.

12           The defense opposes the application of that more

13   than minimal planning enhancement as proposed by the

14   Government.

15           I've read your written submissions on these

16   objections.  I'll hear from you further on it if would you

17   like to be heard.  So starting with you, Ms. Moore, regarding

18   the more than minimal planning enhancement.

19           MS. MOORE:  The application note to section 2A2.2

20   indicates that the things such as wearing a ski mask or

21   learning of a particular place constitute more than minimal

22   planning.

23           Looking at the video you can see that the defendant

24   and his co-conspirators coordinated their attack.  Two of them

25   approached.  The victim walks from after taking a shower back

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1   to his cell.  The defendant leaves his cell on the lower level

2   of the prison.  He walks to the mezzanine where another

3   co-conspirator, Dennis Cooper, is waiting.  You can see him

4   looking up towards the victim's cell.  The defendant, Luis

5   Rivas also comes to the mezzanine.  You can see them looking

6   at each other.  They split up.  The defendant, Mr. Rivas,

7   approaches from one direction, the defendant, Dennis Cabrera

8   approaching from another direction, so as not to have three of

9   them approaching drawing additional attention to themselves.

10          Once they get to the cell, they wait for all three

11   of them to congregate outside of the victim's cell.  They go

12   in.  They assault the victim.  They close the door to prevent

13   anyone seeing what they are doing and stop them from

14   assaulting a victim.

15          Then after the assault takes place, again, they

16   depart in a coordinated fashion with two of them going one way

17   and one of them going another way again, so not all three of

18   them are together and drawing additional attention to

19   themselves and to their attack.

20          I'll note that the District Court in this district

21   in United States V. Baires, 2016 Westlaw 738-766 from 2016,

22   indicated that it was appropriate and it did apply two offense

23   level for minimal planning where, quote/unquote, the defendant

24   engaged in more than minimal planning in speaking with

25   co-defendants to coordinate the attack.

SENTENCING

1          I think the coordination of the attack in this case

2    also would warrants the application of the more than minimal

3    planning.

4          In Ms.Todd's response to our letter from December 6,

5    she objects to the discussion of the prior call that one of

6    the co-conspirators makes with his girlfriend discussing their

7    plan to attack the victim, and claims that that cannot be

8    imputed to him in establishing that more than minimal planning

9    took place in this case.

10          However, the Second Circuit has expressly rejected

11   such a contention in U.S. v. Mohammed, 108 F.3d 1370 from

12   1997.  The Second Circuit said, quote, More than minimal

13   planning, dot, dot, dot, is an offense characteristic not a

14   characteristic of the individual defendant and therefore

15   actions from co-conspirators and confederates can be

16   considered in determining whether more than minimal planning

17   took place in this case.

18          I think wearing a ski mask under the guidelines is

19   sufficient to establish that more than minimal planning

20   occurred.  The coordinated attack that the defendant and his

21   co-conspirators carried out, as you can see through the video,

22   substantiates the request that those two-level enhancements

23   should be applied in this case.

24          THE COURT:  Did you want to respond?

25          MS. TODD:  I thought she, Ms. Moore, was going to go

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1  through all of her objections and then I would.

2            THE COURT:  I thought -- the videos, you're not

3  showing at this point?

4            MS. MOORE:  I can show it at this point if it's

5  helpful in explaining the more than minimal planning.

6            THE COURT:  No, I've seen the videos.

7            Ms.Todd, perhaps you should explain why this doesn't

8  apply.

9            Let me tell you what I'm thinking.  Having reviewed

10  the video, I think in and of itself it would be enough to

11  accomplish that there was premeditation and planning by these

12  three individuals.  There is no question that they coordinated

13  the timing of it because it coincided exactly with the victim

14  going into his cell.  And as Ms. Moore has recounted, the

15  three individuals, the co-defendants, Mr. Rodriguez and his

16  co-defendants, approach from different sides.

17            I've seen the video from all different angles.  It's

18  clear that there is some signaling going on at least between

19  two of them.

20            So I find that based on the way this assault

21  happened in and of itself would be enough to my mind.  But it

22  is buttressed by other evidence; namely, this phone call

23  between Mr. Cabrera and his girlfriend, in which Cabrera says,

24  We have to go attack this Latin Kings member, which I gather

25  or perceived Latin Kings member, which appears to be a clear

SENTENCING

1   reference to the actual victim of this attack.

2           While you're correct there is no evidence, direct

3   evidence, that Mr. Cabrera then spoke to Mr. Rodriguez or the

4   other co-conspirator about attacking them, the fact that it

5   was coordinated indicates to me that there was some plan

6   before the actual attack.  And the call preceded the attack,

7   so it is a fair inference.

8           And I find by a preponderance that Cabrera must have

9   communicated the order or the sense of duty or omission that

10  accompanied this attack on the victim.  As well as the fact

11  that the defendant is a member of MS13, as are the other two

12  assailants.  This is part of what the MS13 does.

13          I do agree with the recitation by the Government of

14  the relevant case law.  And that here I should consider, as I

15  have, the offense conduct, which is that this was an attack

16  that your client has admitted was carried out, in part,

17  because of his membership with MS13.  That's clearly what the

18  phone call with Mr. Cabrera confirms, albeit obliquely.

19          The fact that the three perpetrators were all MS13

20  members, that all of them admitted that they did this because

21  of or in furtherance of their membership is further evidence

22  of planning and premeditation even beyond the way the attack

23  was carried out in and of itself.  You can argue, but as you

24  can tell, I'm pretty convinced just by the irrefutable

25  videotape evidence itself.  I appreciate your advocacy, but

SENTENCING

1   I'm not sure you're going to convince me otherwise.  With

2   that, did you want to say anything?

3           MS. TODD:  That's quite a challenge, Judge.  I will

4   rely primarily on my written submission.

5           I'd also like to add, respectfully I disagree in

6   that because there are rival gangs.  We have seen this every

7   so often particularly in close quarters where it doesn't

8   require any planning or any forethought, the presence of

9   another rival gang member encourages conflict.

10          THE COURT:  Or provokes it.

11          MS. TODD:  Or provokes conflict.  That's how I look

12  at this based on my experience representing 18 Park gang

13  members, MS13 gang members, that often times it's not a

14  coordinated effort.  They recognize what membership the other,

15  what gang membership the other person is affiliated with and

16  in the spur of the moment an assault occurs.

17          I think that's how I looked at this, Judge.  I

18  recognize the Court takes a different position.

19          But I don't believe that there was any sort of

20  meeting and discussion about what should happen, how it should

21  happen.  And that Mr. Cabrera's conversation with his

22  girlfriend was him lamenting on a recognition as part of MS13

23  they are expected to engage in these types of behavior, and he

24  was having a difficult time accepting that, expressing that he

25  was frustrated with wanting to do that but if he didn't then

SENTENCING

1    he would be the target of the assault.

2            So that's all I'll say on that matter, Judge.

3            THE COURT:  Thank you, Ms.Todd.  I appreciate what

4    you're saying.

5            I actually think that Mr. Cabrera's reluctance as

6    expressed with his phone call to his girlfriend is perhaps a

7    further case of coordination of planning.  To some extent it

8    would appear that Mr. Cabrera had to be talked into it or at

9    least had to talk with the other two before they decided to

10   stage or execute this coordinated attack.  Because there

11   clearly is some coordination going on based on how they

12   approached it and the exact timing, and the fact that they

13   came from different directions and weren't all together, which

14   as you've suggested would have suggested more of a spontaneous

15   eruption or decision when the three were standing together and

16   decided to act upon what is a generalized duty to retaliate

17   against rival gang members.  This had all the hallmarks, to my

18   mind watching the video, of a coordinated attack where they

19   approach it from different angles or stairwells even.

20           I think it's fair to infer, and I find by a

21   preponderance, it was because they were trying to avoid

22   suspicion or not draw attention to themselves.  The phone call

23   to me buttresses the notion that this planning or

24   consideration or premedication about it started sometime

25   before.

SENTENCING

1          I think it's the confluence of all of those pieces

2     of evidence, which to my mind establishes by a preponderance

3     the applicability of this enhancement.

4          MS. TODD:  I accept the Court's position.  I would

5     be remiss if I didn't add also, with respect to the Court's

6     consideration of that phone call often times what we heard on

7     that phone call could be as a result of someone else at a

8     higher level directing him that he need to do this, and he's

9     having that conflict with not wanting to do it, as we find

10    quite often as there is a leader directing what is going on.

11    That's all I will say.

12         THE COURT:  I agree with you with that.  And in fact

13    maybe Mr. Cabrera's attorney, I assume he or she will, will

14    raise that as some possible mitigation.  But that to me speaks

15    to coordination, even from on high.  All three of these MS13

16    members somehow got the same call to arms, if it you will.

17         I will say one last thing so the record is clear,

18    the Government suggested that the fact that the defendant had

19    created a makeshift knife was evidence of premeditation.  I

20    agreed with the defense on that, that it's equivocal because

21    it's possible, though not good, that he created that knife

22    independent of this attack, and just wanted to have such a

23    weapon while in the prison.  That's not a positive fact for

24    the defendant, but I don't think it I can necessarily

25    attribute it to this attack.  So I didn't consider that in

SENTENCING

1    making my ruling.

2            Adding two levels to the total offense level would

3    be 22.

4            Let me make sure though, again, so the record is

5    clear, that the other enhancements that were of some dispute

6    earlier, the physical restraint enhancement and also the

7    seriously bodily injury enhancement; so the latter was

8    lowered, the former was added.  Is either side still

9    maintaining an objection to what probation did with respect to

10   those?  Ms.Todd?

11           MS. TODD:  I think it comes out as a wash, right?

12           THE COURT:  It ultimately does, but you can still

13   argue against the physical restraint enhancement if you would

14   like.  It wasn't in your written reply.  I'll give you the

15   opportunity if you want to make any argument.

16           MS. TODD:  No, Judge.

17           THE COURT:  I've watched the video, I think the

18   Government is correct and probation came out the same way.

19           MS. TODD:  I have no further arguments.

20           THE COURT:  Is the Government arguing about the

21   serious bodily injury reduction from five to three?

22           MS. MOORE:  No, your Honor.  In our calculation, in

23   our written submission, we agreed that three levels was

24   appropriate.

25           THE COURT:  I'm adopting a guideline level that does

SENTENCING

1    include the one in the addendum to the PSR, but adding two

2    levels for more than minimal planning.  That means that the

3    total offense level is 22, and criminal history category one.

4    That corresponds to a guideline range of 41 to 51 months as my

5    starting point.

6           Are there objections to anything else in the

7    presentence report or addendum that weren't addressed by

8    probation?

9           MS. MOORE:  Not from the Government.

10          MS. TODD:  No, your Honor.

11          THE COURT:  When I say addressed, meaning adopted in

12   the way that the party argued.  Ms.Todd?

13          MS. TODD:  Yes.  The Probation Department is asking

14   for the Court's consideration of an enhancement based on my

15   client's open criminal cases in state court.

16          THE COURT:  Or that they argue that his criminal

17   history --

18          MS. TODD:  Underrepresents his criminal history

19   category.

20          THE COURT:  Right.  Well, one thing I won't do is I

21   won't have the Probation Department remove that statement from

22   the report, that is their opinion.  I note your objection to

23   it.

24          But as I'll discuss in a moment, I too think that is

25   a factor.  I tend to agree with probation.  I do agree with

SENTENCING

1    probation that criminal history category one does not capture

2    fully the defendant's potential for recidivism or future

3    crime.  I'll hear your argument on that, but I'm not going to

4    change anything in the presentence report or addendum on that

5    issue.

6              So to the extent that you object to that statement

7    by probation, I overrule that objection or reject it.

8              I will adopt the presentence report with the one

9    correction to the enhancement that I mentioned and the total

10   offense level as well as the corresponding guidelines range,

11   which is now 41 to 51 months.

12             I've read and reviewed the parties sentencing

13   submissions.  Ms.Todd, would you like to be heard further?

14             MS. TODD:  Yes, your Honor.  I wanted to start,

15   Judge, with the open cases as part of my effort to convince

16   the Court that that is a consideration that does not warrant a

17   greater sentence for a number of reasons.

18             Fundamentally, Judge, I think it's important that we

19   do not presume Mr. Rodriguez's guilt based on his open cases.

20   I understand that the way the probation phrases it, it's an

21   underrepresentation of his criminal history category.  I read

22   that to believe it's somewhat an end-run around the

23   Constitution.

24             None of his -- let me stay with that for a minute,

25   Judge.

SENTENCING

1              I know respectfully that operandi doesn't speak

2      specifically to the situation that we find ourselves in with

3      respect to his open cases, but it does inform our decision

4      that a defendant's criminal history or a defendant's

5      sentencing shouldn't really be enhanced based on a lack of a

6      finding of guilt where that is really the issue.  Because I

7      believe such an enhancement, Judge, violates Mr. Rodriguez's

8      due process.

9              The cases -- he's presumed innocent until proven

10     guilty, the cases are being litigated vigorously.  I've been

11     in constant communication with his state lawyer.  I believe

12     they are going through the issue of suppression at this point

13     and pretrial motions.  We're not privy to the unbiased facts

14     of what really happened, we're just privy to what the actual

15     charges are, and they are serious charges, but those are

16     simply what they are, they are allegations of criminal

17     conduct.

18             I've outlined some the facts as I know them based on

19     my conversation with his state court attorney as to what

20     occurred.  Again, I'm not representing him, I haven't seen the

21     discovery.

22             So Judge, I want to reiterate to increase his

23     sentence based upon his open state case by suggesting that his

24     criminal history category is understated or underrepresented

25     is an end-run around the Constitution and violation of his due

1   process I would encourage the Court not to enhance his

2   sentence based on his open cases.

3           THE COURT:  Let me ask you, even if I put aside

4   those charges upon which he's been indicted based on a

5   probable cause standard, and looked only at the fact that he

6   committed this crime while incarcerated on other oral charges,

7   do you think that that fact alone, which is not in dispute,

8   isn't relevant to his propensity for repeat offense and being

9   undeterred by his interactions with the Criminal Justice

10  System including arrest and incarceration?

11          MS. TODD:  Judge, I don't think it's not relevant.

12  I think the Court should consider it.  But I also recognize

13  that that very same conduct is the conduct of his guilt for

14  which he is charged with and is being pushed for.

15          THE COURT:  It drives his guidelines to some extent.

16  It's already accounted for in his guidelines, you would argue?

17          MS. TODD:  Correct.  The guidelines account for that

18  behavior.  And the enhancements, which we've just spent the

19  last 20 minutes addressing, account for that.

20          To add to that, during the entire time that he's

21  been at MDC, within the Bureau of Prisons he hasn't committed

22  any infractions, hasn't gotten himself in any violent issues,

23  no problems whatsoever with respect to that.

24          THE COURT:  Let me ask the parties because now I'm

25  thinking about this.  His criminal history category is zero,

SENTENCING

1   I'm wondering shouldn't there have been at least one point

2   assessed for the fact that he committed this crime while in

3   the Criminal Justice System?

4            MS. MOORE:  I believe there is an enhancement for

5   that, although I think it is something that the Court should

6   consider in sentencing him.  There is an enhancement where the

7   criminal conduct takes place while someone is under a

8   sentence.

9            THE COURT:  That's the distinction, since he was

10  only in pretrial detention.

11           MS. TODD:  That's not my understanding, though.

12  When you commit a crime while on probation --

13           THE COURT:  That's following conviction.  I think

14  the distinction is that this doesn't get factored into his

15  criminal history category or calculation because he wasn't

16  convicted so he wasn't technically being supervised in the

17  same way by the Criminal Justice System.  Apropos of your

18  point, Ms.Todd, that he hasn't been found guilty or hadn't

19  been found guilty of anything at that point.

20           But let's go on, I can look at this issue on my own.

21  Go ahead.

22           MS. TODD:  The other aspect that I wanted to address

23  is Mr. Rodriguez's what I consider inappropriate placement in

24  it the SHU for no disciplinary reasons whatsoever.  Simply the

25  mere fact that they had no room he was placed in the SHU and

SENTENCING

1   was in the SHU for three months.

2            Being in the SHU is a harsh confinement space.  He

3   was treated as if he was being punished, as all of the other

4   SHU inmates are.  I think that is a factor that the Court

5   should consider in the ultimate sentence that the Court

6   decides is appropriate for him.

7            I suggested to the Court 24 months as an appropriate

8   and fair and just sentence.

9            I've seen the injuries of the victim.  They are

10  real.  He suffered physical injury, which is unfortunate.

11  They are not, however, serious according to the medical

12  records.

13           Mr. Rodriguez's entire life I believe is a powerful

14  mitigator.  The Government taking the position that there are

15  other immigrants that come here and do not commit crimes and

16  not done what he has done.  But his whole life has not been

17  about committing crimes.

18           If we look at even his open cases, they are not MS13

19  related at all.  He has had gainful employment over a number

20  of years, supporting his family.  They speak kindly and warmly

21  of him.  He has a ten-year old daughter, which he is very

22  close to and he was the primary breadwinner of that family.

23           Mr. Rodriguez does not deny his association and

24  membership with MS13.  I've discussed in my written submission

25  how that occurred.  His drafting into MS13 is really no

SENTENCING

1    different than any of these young men who come here with no

2    family and latches on to them for food, clothing and a place

3    to stay.  And then it transforms into something else over the

4    years.  He is no different than that.

5         But he has his own set of problems and maybe that

6    contributed to his lack of participation to a greater extent

7    in the organization; because he's with all do respect to

8    Mr. Rodriguez, he's a drunk.  He has a significant alcohol

9    problem.

10        Judge, I think you have the discretion to do what is

11   fair and just.  I think a 24-month sentence is a fair and just

12   sentence.

13        When the Court considers all the 3553 factors, all

14   of the cases that expresses how sentence should be individual

15   and that it need not be greater than necessary to punish him.

16   I think a 24-month sentence would address the need for not

17   just punishment and deterrence, also taking into account the

18   fact that he will be deported.  So I think the issue of

19   deterrence is addressed in his particular circumstance because

20   he'll be kicked out of the United States.

21        I rest on the rest of my written submission.  I ask

22   the Court to consider recommending to the Bureau of Prisons

23   somewhere close to New York City so he can maintain contact

24   with his family.  Thank you.

25        THE COURT:  Thank you very much.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1        I'll hear from the Government if it wants to be

2    heard beyond its written submission and the other information

3    it's provided.

4        MS. MOORE:  Just briefly.

5        I think my computer died.  You indicated you watched

6    the video, so you've seen kind of what happened in this case.

7        The defendant and two other members of the violent

8    trans-national criminal organization MS13, while incarcerated

9    on serious charges, the defendant was facing attempted murder,

10   arson and robbery for two different incidents, decided to

11   attack a suspected Latin King member.  For no reason other

12   than they suspected he was a Latin King.

13       He had not done anything to them, was coming back

14   from the shower, was alone in his cell, no threat to them

15   whatsoever.  The three of them attack him.

16       You can see Cabrera holding him down while the

17   defendant, who had the makeshift knife and Rivas are punching,

18   kicking, stomping, stabbing him.

19       The initial attack on the second floor of the jail

20   lasts about 90 seconds.  That doesn't sound like a lot, but

21   when three vicious members of MS13 are punching, kicking and

22   stabbing you, 90 seconds feels like an eternity.

23       After that initial attack, after they leave in a

24   coordinated fashion, the defendant and Mr. Rivas go to the

25   same cell on the lower level of the facility.

SENTENCING

1          The victim is walking around.  We can see blood on

2     his face, in his hair, slashes on both arms, numerous.  You

3     can see blood bleeding through his shirt from all the stabs

4     that he received during the attack that the defendant

5     perpetrated.

6          When the victim approaches them on the lower level,

7     it appears he's speaking with them.  The defendant and

8     Mr. Rivas exit the cell and start beating him again, punching,

9     kicking.  The defendant is literally stomping on the victim's

10    head.  At one point Mr. Cabrera sees that the two of them are

11    assaulting the victim and he comes and joins them.  The

12    defendant grabs the victim by his hair, pulling him, while the

13    other two continue to assault him.  It's a very vicious

14    attack.

15         THE COURT:  Let me ask you a question.  It seems to

16    me the second attack is prompted by the fact that the victim

17    appears to report the attack to a guard, and appears to walk

18    with the guard to the cell where Mr. Rodriguez and -- not

19    Mr. Cabrera but the other --

20         MS. MOORE:  Mr. Rivas.

21         THE COURT:  Mr. Rivas were.  That's what I saw on

22    the video, is that the guard and the victim are standing at

23    the doorway to Mr. Rodriguez and Mr. Rivas' cell.  And then

24    when the guard walks off, at least the camera view, the two

25    defendants, Mr. Rodriguez and Mr. Rivas, then start attacking

SENTENCING

1   the victim a second time.

2           MS. MOORE:  Correct.

3           THE COURT:  Seeming in retaliation for reporting the

4   crime, is what I inferred.  Is that the Government's view of

5   the video?

6           MS. MOORE:  Presumably she has to know what

7   happened, he's bleeding.

8           THE COURT:  She comes down there with him.  It

9   appears to me that the victim goes to the guard at some point,

10  the guard accompanies him to the cell.  He appears to me to be

11  pointing out Mr. Rodriguez and Mr. Rivas, the perpetrators, or

12  at least I see them going up to the window of that cell.

13          Then for some reason the guard leaves.  I don't know

14  why.  That's when the second attack begins.  But she comes

15  back during the middle of that attack, on the video, and they

16  still continue.  Until some later point that she leaves, I'm

17  guessing maybe to get help, then comes back again, only then

18  do they stop.

19          MS. MOORE:  I think that's a reasonable

20  interpretation.  I'll note from one of the views you can see

21  before Cabrera joins them, her radio is dropped on the ground.

22  She runs back to grab it.  I don't know when she gets the

23  radio, when they see she has that that stops them.  As you're

24  right, she returns, they are punching, kicking, stomping on

25  him and are undeterred by her presence there.  Potentially the

1    fact that when she gets the radio she could be calling for

2    additional back up that they decide that they've assaulted

3    victim sufficiently at that point.

4            I think given that -- and I don't think anyone is

5    asking that the defendant be, that there is an end-run around

6    the Constitution that he receive a more severe sentence for

7    his at-this point still pending charges.  Although, as you

8    pointed out, those charges have been proven by a preponderance

9    in the state.  He's been indicted on all those charges.

10           It's the fact that while facing serious charges for

11   attempted murder, robbery, for arson the defendant is

12   completely undeterred from engaging in criminal activity in

13   furtherance and in connection with his membership in MS13.  I

14   think it shows a complete disrespect for the law.  And so I

15   think that is something that the Court should consider in

16   fashioning an appropriate sentence in this case.

17           I'll point out, in regards to Ms.Todd's issue that

18   in her initial paper it's a direct consequence of his

19   conviction here that he will be deported, and that's not

20   accurate.  The defendant doesn't have any status in this case.

21   So I think will he be removed because of his complete lack of

22   status in the case regardless of whether or not he had been

23   convicted in this case.  I don't think that it's related to

24   the conviction here, although I'm sure it doesn't help.  But

25   the fact that he had doesn't have any status is an appropriate

SENTENCING

1   basis for him facing future deportation at a later date once

2   his criminal sentence is completed.

3          THE COURT:  Has a detainer been lodged?  I noticed

4   it hasn't been at the time of the presentence report.

5          MS. MOORE:  I'm not sure that it was because even

6   regardless of whether or not he was released here he was

7   facing state charges and was not bailed out in that instance.

8   So I'm not sure at this point a detainer has been lodged given

9   his incarceration here and in the state there wasn't a need at

10  that point.

11         THE COURT:  I suggest the Government take care of

12  that.

13         MS. MOORE:  The Government will do so.

14         I think Ms.Todd also suggested that the guidelines

15  in this case also accounted for this taking place in a prison.

16  As we went through the objections, there is no enhancement at

17  all for that he's doing this in prison, that he's doing this

18  while facing other charges.  The guidelines don't take that

19  into consideration at all.

20         I think's an appropriate fact.  It does speak to the

21  possibility that he will continue to commit additional crimes

22  in the future.

23         THE COURT:  When you say enhancement, you're

24  referring to his criminal history category.

25         MS. MOORE:  Either that, but it's not an enhancement

SENTENCING

1    to the guidelines themselves and it's not factored into his

2    criminal history category either.  It's something that is

3    unaccounted for in the guidelines.

4            I'll note with regard to his time in the SHU.  There

5    are a number of MS13 members housed at the MDC.  There have

6    been numerous incidents of violence between MS13 members and

7    other members of the general population.  I believe a Blood

8    was paralyzed after an attack from an MS13 member.  Other MS13

9    members when they were trying to attack a Trinitario actually

10   grabbed a prison guard and threw her so they could more

11   effectively attack the rival gang member.  They ended up

12   throwing her into a wall.  She hit her head against the

13   concrete and lost consciousness.  That's all to say there are

14   serious issues of housing MS13 members at MDC that the

15   facility has to deal with.

16           There is only, as I understand it, two units in the

17   facility where MS13 members can be housed because of all the

18   other rival affiliations they don't want things like what

19   happened in this case to happen at the MDC.  Given the last

20   time the defendant was housed with in particular his

21   co-defendants and other MS13 members, the three of them

22   engaged in a concerted attack of another inmate.  Separations

23   were put in place so he wouldn't be housed with the three

24   people that he previously stabbed and beaten another inmate

25   for.  That is the reason he was put in the SHU to protect the

SENTENCING

1   other inmates.  It was no intent to punish him.

2           THE COURT:  Say that last part again.

3           MS. MOORE:  I understood from the MDC that he was in

4   the SHU because separations were put in place separating him

5   from his co-defendants.  As I understand it from the MDC,

6   there are two units were MS13 can be housed because there are

7   so many Bloods, Latin King, or Trinitarios there that they do

8   not want or cannot safely house MS13 members in the same unit

9   with.  So it was a result of those separations which were put

10  in place in an attempt to keep other inmates safe that he was

11  housed in the SHU.

12          THE COURT:  Let me say to both parties, I'm not

13  going to rely on the reason behind the defendants SHU

14  placement one way or the other in assessing whether he's

15  entitled to some reduction in his sentence because he was in

16  the SHU for three months.  I have considered that fact

17  standing alone without any analysis or consideration of why he

18  might have been there.  I don't think I have enough

19  information or competent evidence to resolve that.  I don't

20  think it's necessary to have a hearing.  I will give some

21  consideration, although not a lot, to that fact.  I don't

22  think I can responsibly resolve that question given what I

23  will call hearsay statements from both sides about what they

24  were told was the reason, whether it was too many people,

25  overcrowding, or because of the concern of MS13 and other gang

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1   members being housed in general population together.  I don't

2   need to resolve that.  I'm not going to do that.

3          THE COURT:  Anything else, Ms. Moore?

4          MS. MOORE:  No, your Honor.

5          MS. TODD:  If I may, I just wanted to, because

6   troubles me, that Ms. Moore mentioned with respect to

7   Mr. Rodriguez's open case that there is a preponderance of

8   evidence of his guilt in view of the Indictment.  And that's

9   not the law, that's never been the law, that's so troubling to

10  me.  An Indictment is merely that there is probable cause that

11  a crime has been committed, that's it.

12         THE COURT:  Right.  But the question is, isn't

13  probable cause more than a preponderance.  I think that's what

14  the Government is arguing.  I certainly find that there is at

15  least enough for a preponderance that these incidents

16  occurred.  How much weight I give them will be affected by the

17  fact that he hasn't been convicted of them but only charged.

18  But based on a probable cause standard, which I believe is

19  higher than preponderance; in other words, there is reason to

20  believe he committed these crimes such that an Indictment can

21  be brought, preponderance is just more likely than not which

22  you couldn't indict somebody on.  To my view, it actually is;

23  namely, probable cause is a higher standard, which is why

24  Ms. Moore argued as she did.  I haven't looked at the case law

25  on this particularly, whether they can be compared in that

SENTENCING

1   manner.  I can tell you the fact that he's been indicted on

2   these charges is something that I have considered, and I

3   believe establishes beyond a preponderance that he was

4   involved in this conduct as alleged in those cases.  But I

5   understand that you disagree.

6           MS. TODD:  I do, Judge, respectfully.

7           THE COURT:  Yes, of course.  I'll explain my

8   consideration of it.  I don't think it's as critical to the

9   decision on the sentence as you might think notwithstanding my

10  comments.

11          Is there anything else you wanted to say?

12          MS. TODD:  It's okay.

13          THE COURT:  Mr. Rodriguez, you have the right to

14  make a statement at this time.  Would you like to say

15  anything?

16          THE DEFENDANT:  Yes.  I wanted to apologize for

17  everything that happened and wish everybody a Merry Christmas.

18          THE COURT:  Anything else?

19          Thank you, Mr. Rodriguez.

20          I have considered the relevant factors set forth by

21  Congress entitled in United States Code 3553(a) including the

22  advisory guideline range of 41 to 51 months, which applies

23  here, to ensure that I impose a sentence that is tough but not

24  greater than necessary to comply with the purposes of

25  sentencing.  Those purposes include the need for the sentence

SENTENCING

1   to reflect the seriousness of the crime, to promote respect

2   for the law, to provide just punishment for the offense, to

3   deter criminal conduct by Mr. Rodriguez as well as others who

4   would seek to engage in this type of criminal conduct, and to

5   protect the public from future crime by Mr. Rodriguez.  I have

6   also considered the nature and circumstances of the offense to

7   which Mr. Rodriguez has pled guilty and his personal history

8   and characteristics.

9        Regarding my specific consideration of those

10  factors, the seriousness of the crime, this was obviously a

11  very, very serious and violent crime.  The defendant and the

12  victim, I should say the defendants and the victim, are lucky

13  that the victim wasn't hurt worse and didn't suffer any

14  permanent injury or even death.

15       The attack was brutal.  It was perpetrated by three

16  men against one lone man.  And it involved the defendant's use

17  of a makeshift knife that he used to cut and I assume try to

18  stab the intended victim.  Fortunately, the victim appears to

19  be a fairly strong young man who was able to not only survive

20  the attack but survive it with non-life threatening injuries.

21       However, as the Government has argued and as I have

22  seen from myself from the video and can infer from the medical

23  reports provided to me, he did suffer some serious lacerations

24  that required sutures or stitches.  And he was injured all

25  over his body based on the video that I saw or at least his

SENTENCING

1    upper body that I saw with multiple cuts, bruises,

2    lacerations, a swollen face.  I also saw for myself the

3    viciousness of the attack perpetrated by these three men for

4    no reason whatsoever.  A senseless attack against a perceived

5    gang member in prison.

6         I was particularly struck by the viciousness of the

7    second attack, which was more fully on the video.  Which, as I

8    mentioned earlier, view as being in retaliation for the victim

9    having reported the initial assault to the guard.  Because

10   it's clear to me when I see the video that the second attack

11   occurs right after the guard and the victim go to the cell in

12   which Mr. Rodriguez and Mr. Rivas were.  And it appears to me

13   that the victim is identifying Mr. Rivas and Mr. Rodriguez as

14   the perpetrators to the guard.  It's only when the guard

15   leaves the scene that the two men, Mr. Rodriguez and

16   Mr. Rivas, reinitiate their attack on the victim in this very

17   brutal fashion including kicking and punching.

18        They are joined by Mr. Cabrera, who must have seen

19   them attacking the victim again and comes running to their aid

20   and started viciously kicking the victim as well.

21        As I should have made clear before, I found all the

22   enhancements were established by a preponderance and that

23   included the physical restraint enhancement as well as the

24   serious injury enhancement up to three levels.  Because of

25   what I saw on the video, which included the victim being held

SENTENCING

1   down so that the other two men could punch him and kick him.

2   Obviously there is an enhancement for use of a dangerous

3   weapon, but that is undisputed since this defendant admitted

4   bringing his makeshift knife to the fight and using it, as

5   reflected in the cuts and lacerations suffered by the victim.

6          There is clearly a need for punishment here.  This

7   type of gratuitous and senseless violence warrants serious

8   punishment.

9          It's also clear that this type of gang-related

10  attack requires general deterrence, a message of general

11  deterrence reflected in the conversation that Mr. Cabrera had

12  with his girlfriend.  This was likely an attack ordered by

13  others who are members of MS13.  And it's clear that the

14  motivation of all three defendants, who have admitted as much,

15  was to carry out the bidding and to enhance the reputation of

16  MS13 as a violent street gang.  It's clear that MS13 as a gang

17  lives on violence as its currency, and uses it or the members

18  use it as a mean to enhance their reputation and stature

19  within the organization and that's what happened here.  MS13

20  is a vicious gang that preys not only on rival gang members or

21  perceived gang members, but on innocent members of the

22  community.

23         This attack, which was carried out for this reason,

24  warrants a message of general deterrence through a sentence

25  that is longer than 24 months.  There is also a need here to

SENTENCING

1   protect the community from future violence and harm by

2   Mr. Rodriguez, who expressed minimal remorse based on his own

3   statement.  And there is also a very strong need for specific

4   deterrence here.

5          While this is the defendant's only adult conviction,

6   his arrest record and the fact that he committed this crime

7   while in prison on indicted charges of arson, attempted

8   murder, robbery, and gang related assault speaks to his

9   propensity for violence and the likelihood that he will be

10  undeterred unless he's send a very specific message that he

11  not engage in this crime without consequence.

12         His conduct is particularly disturbing to me because

13  he did this as an adult.  He's actually older than many MS13

14  members.  While it appears from the Probation Department's

15  report and even the defense submission that he was recruited

16  at an earlier age, perhaps as early at 18, to be a member of

17  MS13, he was it appears largely inactive or incapacitated from

18  participating in the gang's activities by his alcohol abuse.

19  And then it appears from what is before me and his arrests

20  starting around the age of 31 that he decided to get involved

21  in MS13 activities at an adult, after he turned 30.  Which is

22  inexplicable to me, but speaks to the fact that he would have

23  continued or will continue if he's not sent a message that he

24  cannot do this.

25         Now I will say this, Ms.Todd, you have argued deftly

SENTENCING

1    on his behalf.  But in many ways the don was cast before the

2    defendant was arrested here in this case and before you began

3    representing him.  He has created a record that is hard for me

4    to ignore.  Which has a series of violent activities all

5    within about one- or two-year span, that speak to his

6    commitment to engage in violence as part of his MS13

7    membership or maybe to build his stature within the group.

8    Whatever the reasons, he has been on a rampage for the last

9    couple of years.

10        Here he admitted that he carried out a brutal

11   assault while in the prison system.  Now he did not get any

12   points in his criminal history for that because for a 1.1D --

13   E rather, only adds a point if the crime of conviction

14   sorry-- D this is under D -- if the crime of conviction

15   occurred while the defendant was under any criminal justice

16   sentence, which would include probation, parole, supervised

17   release, imprisonment, work release or escape status.  That is

18   what I was thinking when I wondered why there wasn't a

19   one-level or two-level point enhancement under his criminal

20   history, but that's the explanation.

21        He hasn't been convicted of anything and is still

22   awaiting trial on his state court matters.  So his criminal

23   history does in my mind underrepresent the seriousness of his

24   criminal conduct.

25        Let me address the question about preponderance of

SENTENCING

1    the evidence versus probable cause.  The bottom line is, at

2    sentencing I can find based on the representations in the

3    presentence report by a preponderance, as I've done, that he

4    engaged in other criminal conduct.  That conclusion to me is

5    buttressed and established by the fact that he's been indicted

6    on multiple crimes.  So that it means that a Grand Jury after

7    hearing evidence decided that there was probable cause to

8    believe he was involved in all these crimes.  That to me is

9    sufficient for purposes of preponderance with respect to his

10   history and characteristics and the likelihood of recidivism

11   and the need for specific deterrence.

12          I'll note for the record under the guidelines

13   whether the defendant was pending trial or sentencing on any

14   other charge at the time of the instant offense, this is under

15   4A1.3(a)(2)(d),  would form the basis for an upward departure

16   under the guidelines.  Now I'm not upwardly departing, but I'm

17   certainly considering his commission of the crime which is the

18   most significant thing while awaiting trial on multiple

19   charges as a sentencing factor and a basis for a sentence that

20   will achieve the purpose of specific deterrence.  So I don't

21   think there is anything improper under the guidelines or

22   otherwise with respect to my consideration of the fact that he

23   was pending trial and had been charged by Indictment for

24   multiple crimes at the time he committed this offense.

25          I also think the fact that he's a member of MS13

SENTENCING

1  goes to the potential for recidivism.  It is clear to me, and

2  he admitted it, that he engaged in this crime as a result of

3  or as part of his MS13 membership.  And his membership has not

4  lapse, as far as I can tell, he's not indicated any desire to

5  leave the gang.  Even now, he hasn't expressed any indication

6  that he intends to divorce himself or quit the gang and that

7  to me spells trouble if he's released any time soon.

8        I have considered, as argued by the defense, the

9  defendant's poor and impoverished family circumstances, which

10  are certainly tragic, but regrettably not uncommon for many of

11  the defendants who engage in criminal conduct such as this or

12  join gangs like MS13.  I don't find it to be a significant

13  mitigating factor with respect to the violence that he engaged

14  in, which was brutal and senseless, as I said before, and also

15  committed while he was pending trial in other criminal cases.

16        Also I find that as terrible as his upbringing was,

17  the defendant was 30-plus years old at the time.  He made a

18  choice to start working closely with MS13 and engaging in

19  violence as part of his membership in MS13.  That to me

20  attenuates any effects really of his horrific upbringing.  I'm

21  sure that his upbringing and all the circumstances of his life

22  have led to his alcoholism and perhaps his poor choices, but I

23  don't think given his age and given the fact that the

24  defendant actually was engaged in law abiding conduct,

25  including employment, and chose to do this with his MS

SENTENCING

1  co-defendants while incarcerated and while facing other

2  potential jail sentences is something that renders his prior

3  circumstances irrelevant.

4          So as I said before, Ms.Todd, notwithstanding your

5  eloquent and zealousness in his defense, he has written his

6  own fate in many ways by the conduct he has chosen to engage

7  in as an adult and as part of a gang.

8          The last thing I'll address is the argument about

9  him being in the SHU for three months.  I have considered it

10 and it does mitigate, albeit it slightly, the sentence that I

11 would have imposed.  Because I don't know why he was in the

12 SHU, all I know that is that he was in the SHU.  Even if I

13 accept the fact as represented by the Government, which makes

14 perfect sense to me based on what I know about our prison

15 system or the circumstances over at the MDC, that he was

16 housed there because there are so many gang members at MDC

17 awaiting trial that they have to be separated from each other

18 to prevent violence, that's not necessarily something that the

19 defendant himself has any control over or is a fair reason

20 perhaps for him to have been placed in the SHU.  I'll note

21 also, though, that the SHU while severe with respect to social

22 isolation isn't necessarily far, far worse than being housed

23 in general population.  One might argue the defendant was

24 safer from attacks from rival gang members in the while in the

25 SHU and was celled in a one or two person cell; he could have

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1   been celled alone.  Nonetheless, the SHU is not pleasant.  I

2   have given it some consideration, although not as much as the

3   defense would probably argue is warranted.  It certainly will

4   reduce the sentence by a month or two, but not as much as

5   three months, which is the time he spent in the SHU.  But I've

6   given it consideration.

7          Putting all of these factors together and based on

8   the advisory guideline range of 41 to 51 months, I'm going to

9   impose a sentence of 48 months on Mr. Rodriguez.  It is

10  because of the nature of the crime he committed.  And under

11  the circumstances under which he committed it that I think

12  this sentence is warranted.

13         I will reenforce or reiterate that there a genuine

14  need for specific and general deterrence here as well as

15  punishment.  I impose that sentence consecutive to any

16  potential sentence the defendant may receive in connection

17  with his pending state court cases and prosecutions.

18         I also impose a term of three years of supervised

19  release to follow this term of imprisonment, with the special

20  conditions that if the defendant is deported he not illegally

21  reenter.

22         That as recommended by the Probation Department, the

23  defendant shall not associate in person through mail,

24  electronic mail, or telephone with any individual with an

25  affiliation to any organized crime groups, gangs, or any other

SENTENCING

1    criminal enterprise.  Nor shall the defendant frequent any

2    establishment or other locale where these groups may meet

3    pursuant but not limited to a prohibition list provided by the

4    Probation Department.

5            I also am imposing a special condition that if the

6    defendant is not deported and he's on supervised release, that

7    he be subjected to drug or substance abuse testing and then

8    participate in treatment if directed by the Probation

9    Department.  He will have to assist with obtaining third-party

10   payment, if possible, if he receives any substance abuse

11   treatment.

12           In addition, a fine, I'm not imposing one because I

13   don't find that the defendant has any ability to pay one.

14           There is no restitution request here I gather,

15   Ms. Moore?

16           MS. MOORE:  That's correct.

17           THE COURT:  No restitution.  I must impose a special

18   assessment of $100 for the count of conviction, which is due

19   immediately.  And forfeiture does not apply here.

20           Is that correct, Ms. Moore?

21           MS. MOORE:  I was just looking up -- could you

22   repeat?

23           THE COURT:  Is forfeiture applicable here?

24           MS. MOORE:  No, your Honor, we're not seeking

25   forfeiture in this matter.

1    THE COURT:  So no forfeiture here as well.

2    Any other aspect of the punishment or the sentence

3    that I have not covered?

4    MS. MOORE:  No, but if you give us one moment we

5    were just looking up --

6    THE COURT:  I will recommend that the defendant be

7    housed at a facility as close to New York City as possible to

8    facilitate family visits.

9    Anything else, Ms. Moore?

10   MS. MOORE:  Nothing from the Government.

11   THE COURT:  I will advise the defendant of his right

12   to appeal, but is there anything else regarding the sentence

13   itself, Ms. Todd?

14   MS. TODD:  No, your Honor.

15   THE COURT:  Thank you.

16   Mr. Rodriguez, you can appeal your conviction if you

17   believe that your guilty plea was somehow unlawful or

18   involuntarily or some other fundamental defect in the

19   proceedings that did you not waive by pleading guilty.  Under

20   some circumstances you can also appeal the sentence that I

21   just imposed.  If you want to appeal your conviction or

22   sentence, a notice of appeal must be filed within 14 days of

23   the filing of the entry of a judgment and that should happen

24   in the next day or so, or within 14 days of the filing of a

25   notice of appeal by the Government if the Government decides

SENTENCING

1    to appeal the sentence that I just imposed.

2            If you chose to appeal your conviction or sentence,

3    the clerk will prepare and file a notice of appeal on your

4    behalf.  And if can you not afford to pay the cost of an

5    appeal or for appellate counsel, you have the right to apply

6    for leave to appeal in forma pauperis.  You can apply to have

7    the filing fee waived or to have court appointed counsel -- I

8    should say and/or to have court appointed counsel for your

9    appeal do you understand that?

10           THE DEFENDANT:  Yes.

11           THE COURT:  Let me note for the record that I'm

12   granting the Government's request to file under seal Exhibits

13   A and A1 to their sentencing submission.

14           With respect to A, which is the DVD, the Government

15   need only, as I understand it, file a photocopy of the disk

16   itself so it's noted on the record what was submitted as part

17   of sentencing and provide it to the defense and the Court.

18           And then A1, which is a screen shot, should be filed

19   in paper form under seal on the docket.  Is that clear?

20           MS. MOORE:  Yes, your Honor.

21           THE COURT:  Anything else we need to address at this

22   time?

23           MS. MOORE:  No, your Honor.

24           THE COURT:  From Ms.Todd?

25           MS. TODD:  No, your Honor.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SENTENCING

1          THE COURT:  Okay, thank you very much, that does

2     conclude the sentencing in this matter.

3               (Whereupon, the matter was concluded.)

4                    *    *    *    *    *

5     I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

6

7

      Rivka Teich, CSR RPR RMR FCRR
8     Official Court Reporter
      Eastern District of New York

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25